## GARDNER & Others *v.* HERZ & Another.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Argued April 19, 1886.—Decided May 10, 1886.

Claim 2 of reissued letters patent No. 9094, granted to William Gardner, Oliver L. Gardner and Jane E. Gardner, February 24, 1880, for an improvement in chair-seats, (the original patent, No. 127,045, having been granted to George Gardner and Gardner & Gardner, as assignees of George Gardner, as inventor, May 21, 1872, and having been reissued as No. 7203, to George Gardner, William Gardner and Jane E. Gardner, July 4, 1876,) namely, "2. A chair-seat made of laminæ of wood glued together, with the grains in one layer crossing those of the next, concave on the upper surface, convex on the lower surface, and perforated, as a new article of manufacture, substantially as set forth," does not claim any patentable invention.

A patent cannot be taken out for an article, old in purpose and shape and mode of use, when made for the first time out of an existing material, and with accompaniments before applied to such an article, merely because the idea has occurred that it would be a good thing to make the article out of that particular old material.

The suggestion in the second reissue, that "the seat is adapted to be secured to any chair-frame, as it is easily cut and fitted to the same," is not found in the original patent, or in the first reissue, and is new matter, so far as anything in it can be invoked to confer patentability on the article.

The question as to whether the thing patented amounts to a patentable invention, may be raised by a defendant in a suit for infringement, independently of any statutory permission so to do.

Under the Constitution and the statute, a thing to be patentable, must not only be new and useful, but it must amount to an invention or discovery.

In equity. The case is stated in the opinion of the court.

*Mr. Edward N. Dickerson* for appellants.

*Mr. James P. Foster* for appellees.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a suit in equity, brought in the Circuit Court of the United States for the Southern District of New York, by William Gardner, Oliver L. Gardner and Jane E. Gardner against Martin Herz and John K. Mayo, for the infringement of reissued letters patent No. 9094, granted to the plaintiffs, February 24, 1880, for an improvement in chair-seats, (the original patent, No. 127,045, having been granted to George Gardner and Gardner & Gardner, as assignees of George Gardner, as inventor, May 21, 1872, and having been reissued as No. 7203, to George Gardner, William Gardner and Jane E. Gardner, July 4, 1876). The application for the first reissue was filed April 8, 1876, and that for the second October 31, 1879. The drawings annexed to the original patent and each of the reissues were substantially the same. Those of the second reissue were as follows:

*Fig.1.*

Fig.2.

The specification and claim of the original patent were in these words:

"Figure one is a plan view, partly in section, the section showing the middle layer of veneer. Fig. 2 is a longitudinal section, taken on the line *x x* of Fig. 1. Similar letters of reference refer to like parts in both of the figures.

"This invention relates to chair-seats; and it consists in constructing a seat out of veneers of wood, with the grain running across each other and glued together.

"I have shown, in the drawing accompanying this specification, three layers of veneers, they being represented by the letters *A B C*. The grain of veneer *A* crosses that of veneer *B*, as shown in section in Fig. 1, and the grain of veneer *B* crosses that of veneer *C*, as seen in Fig. 2. Veneers when thus ar-

ranged, that is to say, with the grain running in diverse directions, will make a seat which, for economy and durability, will be found to be·a very useful improvement. The seats may be left solid, or perforated after some design agreeable to the fancy of the one having them made. A slightly concave configuration may be given to the seat, as shown in Fig. 2.

" Seats thus made do not cost as much as those that are made of cane, and are better by far in point of durability.

"The veneers rest upon a shoulder, *f*, of a frame, *F*, which surrounds them.

" Having thus described my invention, what I claim and desire to secure by letters-patent is—

"As a new article of manufacture, a chair-seat constructed of veneers of wood with the grain running crosswise of each other and glued together, all substantially as set forth, and for the purpose specified."

The specification and claims of the first reissue were in these words:

" Figure 1 is a plan view, partly in section, of my improved seat, the section showing the middle layer of veneer. Fig. 2 is a view of my improved seat for chairs, settees, &c., this figure showing a longitudinal section of the seat, taken on the line *x x* of Fig. 1. Similar letters of reference refer to like parts in both of the figures.

"This invention relates to bottoms for seats, and consists in constructing the said seats of two or more veneers of wood, with the grains crossing each other, the said veneers of wood being glued together by an adhesive substance.

" I have shown in the drawing accompanying this specification three layers of veneer, applied to the construction of and forming a seat for chairs. These layers of veneer are represented by the letters *A, B* and *C*. The grain of veneer *A* crosses that of veneer *B*, as shown in section in Fig. 1, and the grain of veneer *B* crosses that of veneer *C*, as seen in Fig. 2. Veneers, when thus arranged, that is to say, with the grains crossing each other, or diversified, will make a seat which, for durability and economy, will be found to be a very useful improvement. I make the seat either solid, or perforated as shown

in Fig. 1. A slight concave configuration may be given to the seat.

"The perforated seats are made by boring a round hole of any design desired; and they may be bored either by hand or by machinery adapted for the purpose. The perforated seats are desirable, as they are ventilated and ornamental.

"I have especially shown and described my improved seat for chairs. The veneers of which this seat is constructed rest upon a shoulder, *f*, of a frame, *F*, which surrounds them, as shown in Fig. 2 of the drawing. The veneers, with the grains crossed or diversified and glued together, become homogeneous, thus making a solid piece of wood, from which I make the bottom of the seat, which, when perforated and varnished, is ready for the market.

"Veneers, when thus arranged, that is to say, with the grain running crosswise or in diverse directions, will make a bottom for a seat which, for economy and durability, will be found to be a very useful improvement. The bottoms thus made may be left solid, or perforated after some design agreeable to the fancy of the one having them made. A slightly concave configuration may be given to the bottom, as shown in Fig. 2, which greatly adds to the comfort of the party using it. The bottom thus made is secured to a frame, *F*, which surrounds it, and through the latter is secured to the seat-frame, *K*.

"Having thus described my invention, what I claim is—

"1. As a new article of manufacture, a bottom for a seat, constructed of two or more veneers or thin layers of wood, with the grain of the one layer crossing that of the other, and the whole secured together with an adhesive substance, substantially as set forth.

"2. As a new article of manufacture, a bottom for a seat-frame, constructed of two or more veneers or thin layers of wood, with the grain of the one layer crossing that of the other, said layers being secured together by an adhesive substance, and having perforations formed therein for the purpose of ventilation or ornamentation, substantially as set forth.

"3. The combination of a seat-bottom, constructed of two or

more veneers or thin layers of wood, with the grain of the one layer crossing that of the other, and the whole secured together by an adhesive substance, with the frame of the seat, substantially as set forth.

"4. The combination of a seat-bottom, constructed of two or more veneers or thin layers of wood, the grain of the one layer crossing that of the other, and the whole secured together by an adhesive substance, and provided with perforations for the purpose of ventilation or ornamentation, with the frame of a seat, substantially as set forth.

"5. As a new article of manufacture, a wooden bottom for seats, provided with perforations for the purpose of ventilation or ornamentation.

"6. As a new article of manufacture, a seat-bottom constructed of two or more veneers or thin layers of wood, the grain of the one layer crossing that of the other, and secured together by an adhesive substance, said bottom thus formed having a curved or concave configuration on its upper side, substantially as set forth."

The specification and claims of the second reissue were in these words:

"The state of the art in relation to devices having a similarity to my invention may be set forth as follows: In letters-patent No. 15,552, granted" to John H. Belter, "August 19, 1856, a bedstead is described made of veneers glued together, with the grains crossing, and in such patent there is a statement that veneers crossing and glued together had been used for combining strength and lightness. In letters-patent No. 19,405," granted to John H. Belter, "February 23, 1858, chairs and other articles of furniture are described as made of layers of wood or veneers crossing each other, glued together, and pressed to shape. In letters-patent No. 40,509, granted November 3, 1863, boxes are described as made of veneers or layers of wood crossing each other and glued together. In letters-patent No. 23,225, granted" to Zebulon B. Bellows, "March 15, 1859, a chair-bottom is described as made of a piece of board softened by steam and pressed up to shape in moulds. In letters-patent No. 110,096, December 13, 1870,

a barrel is described of laminæ of wood with the grain crossing and glued together. Sheet metal perforated to form chair-bottoms is set forth in A. S. Smith's patent, reissued " to Isaac P. Tice, " June 27, 1865. Chair-seats of enamelled hard rubber and gutta-percha perforated are set forth in letters-patent No. 54,863," granted to J. W. Cochran, " May 7, 1866. Letters-patent No. 51,735, granted December 26, 1865, to J. K. Mayo, set forth numerous articles made of laminæ of wood; and in a subsequent reissue, dated August 18, 1868, mention is made of a chair-seat, but the same was neither concave nor perforated.

" My invention, as distinguished from the foregoing, relates to a new article of manufacture, consisting of a chair-seat made of veneers of wood, with the grains of one veneer crossing the other and glued together, and having a concave or dishing form, and perforated.

" From the foregoing it will be apparent that I do not lay any claim to the veneers crossing each other and glued together, as these have been used for various purposes, and even for furniture, and have become public property. Neither do I claim the pressing of a chair-seat into a concave form by dies. Neither do I claim a perforated seat, as sheet metal has been employed; but it is cold to the person, and liable to break and to catch the clothing. Neither do I claim a single layer of such material as hard rubber or gutta-percha perforated. This is so expensive as not to be adapted to general use.

" My chair-seat is a new article, possessing great strength and durability. It is very light and cheap. It forms an agreeable seat. It is not hot in summer or cold in winter. The perforations give the wood a handsome appearance and afford the required ventilation, and the seat is adapted to be secured to any chair-frame, as it is easily cut and fitted to the same, and the cost of these seats is less than those made of cane, and they are much more durable.

" In the drawings, Figure 1 is a plan, with the upper layer of veneer partially removed. Fig. 2 is a vertical section of the chair and seat.

" I have shown three layers of veneers, $A$ $B$ $C$. The grain of the veneer $A$ crosses that of the veneer $B$, and the grain of the

veneer *B* crosses that of the veneer *C*, and these are cemented together by suitable adhesive substance, such as glue.

"The seat is of a concave or dishing form, so as to be better adapted to the shape of the person, and the under side of the seat is convex.

"The perforations through the seat are to be arranged to produce any design that may be agreeable to the fancy of the person making or using the chair. These perforations make the seat light, and also ventilate the same.

"The edges of the seat rest upon and are secured to the chair-frame; and in Fig. 2 the frame is rabbeted to form shoulders, *f*, upon which the edges of the seat rest.

"I claim as my invention—

"1. As a new article of manufacture, a chair-seat formed of laminæ of wood with the grain crossed, glued together, and concave on the upper surface and convex on the lower surface, adapted to a chair-frame, substantially as set forth.

"2. A chair-seat made of laminæ of wood glued together, with the grains in one layer crossing those of the next, concave on the upper surface, convex on the lower surface, and perforated, as a new article of manufacture, substantially as set forth."

While the first reissue was in life the owners of it brought a suit in equity against the present defendants, in the same court, alleging infringement of the first five claims of the first reissue. An application being made for a preliminary injunction it was denied, in May, 1879. 16 Blatchford, 303. The patent of December, 1865, to the defendant Mayo, and division E of its reissue of August 18, 1868, (both of them mentioned in Gardner's second reissue,) being put in evidence, it was held that what was claimed in the first claim of Gardner's first reissue was described in the two Mayo patents, both of which were issued prior to Gardner's original patent. This related to the veneers, with crossing grains, glued together, of the first four claims of Gardner's first reissue. As to the perforations of the second, fourth and fifth claims of that reissue, the Tice reissue of June 27, 1865, and the Cochran patent of May 22, 1866, (both of them mentioned in Gardner's second

reissue,) were put in evidence, and it was held, that they showed a chair-seat of perforated sheet metal, and one of perforated enamelled india-rubber or gutta-percha, containing every feature of ventilation and ornamentation, resulting from perforations, which Gardner's perforated chair-seat exhibited; and that, in view of those prior perforated seats, there was no patentable novelty in perforating a wooden bottom. The conclusion of the court was, that there was nothing new or patentable in the first five claims of Gardner's first reissue, in view of the patents referred to. It was not claimed that the sixth claim of that reissue had been infringed. The defendants' seat bottom involved in that case was made of two or more veneers or thin layers of wood, with the grain of the one layer crossing that of the other, and the whole secured together with an adhesive substance; and there were slots or slits cut through the seat, as long as the length of the seat bottom from front to rear, leaving longitudinal holes of that length, and thus forming ribs or slats, the effect of which was to make the seat bottom yielding and elastic.

A little over five months after this decision was made, the second reissue was applied for, and about four months after it was granted this suit was brought. The answer attacks the novelty and patentability of the invention and the validity of both reissues. After issue, proofs were taken, and in June, 1882, the Circuit Court rendered a decision, dismissing the bill, 20 Blatchford, 538, and from the decree to that effect the plaintiffs have appealed.

The second claim is the only one in question. It will be well here to repeat it: " 2. A chair-seat made of laminæ of wood glued together, with the grains in one layer crossing those of the next, concave on the upper surface, convex on the lower surface, and perforated, as a new article of manufacture, substantially as set forth." The defendants made and sold such chair-seats.

Referring to the decision as to the first reissue, to the effect that veneers, with the grains of the successive layers crossed and cemented together, adapted for the construction of chairs and settees, were shown in the two Mayo patents, and that the

Mayo reissue, division E, described the shaping of the material, when made pliable, by compression in a matrix or on formers, and that the Tice and Cochran patents showed perforated chair-seats of metal and gutta-percha, the Circuit Court held, in this case, that the only question open, as to the second reissue, was, whether the concavity of form, made an element of the second claim of that reissue, would support the patent. Concurring, as we do, in the views and conclusions of the court, and finding them well expressed in its opinion, we repeat them here :

"Chair bottoms made of board and softened by steam and pressed to a concave shape in a mould, so that the form of the seat will conform to the shape of the person who may occupy it, are shown in the letters-patent issued to Z. B. Bellows, bearing date March 15, 1859. So, also, the concave or dishing form of chair-seats had been adopted long before Gardner's patent, in ordinary chair-seats. In the specification of the present reissue the inventor states that he does not lay any claim to the veneers crossing each other and glued together, as these have been used for various purposes and have become public property, and that he does not claim the pressing of a chair-seat into the concave form by dies.

" If there was no patentable novelty in using the perforations of the metal or gutta-percha chair-seats in the veneer seat by Gardner, neither can there seem to be any in employing a well-known form of chair-seat in his veneer seat. As it had been pointed out by Mayo that the material used is pliable and can be pressed into any desired form, and as the reissue disclaims the pressing of a chair-seat into a concave form, and as chair-seats had been so formed, it is difficult to see how there was any invention in Gardner's chair-seat. Gardner merely applied a process that was old to a material that was old, to obtain an old form. Considered as a combination, it is hardly possible to believe that the perforations or the concavity performed any new functions in the Gardner seat. An ingenious feature has been presented, to the effect that the perforations and concavity co-operate, in Gardner's seat, to prevent warping and curling of the material used. If this is true, the same elements were

combined in the Baillie chair-back and performed there the same functions they performed in the Gardner seat. It may be that the Gardner seat is mechanically a better seat than any which preceded it, but his improvement is not a patentable one.

"It is strenuously insisted, that the popularity and success achieved by the Gardner seat beyond those of his predecessors, affords cogent evidence both of the utility and patentable novelty of his invention. The answer to this argument is, that the success of his seat is probably due to a feature which is not suggested in the original patent, that is, its adaptability for use by unskilled workmen. His seats, as now made, can be fitted without mechanical skill to a bottomless chair, and are largely used to repair chairs in which the original seats have been worn out, and can be so used without any special skill. They are, also, largely sold to chair manufacturers, because they can be easily adapted to chairs of different sizes and seats of different forms. But, the chair-seat described in Gardner's original patent, and shown in the drawings, did not practically possess this characteristic of adaptability, but was a frame seat, which could only be fitted to a chair by a skilled laborer. Such a chair-seat would fail to meet the peculiar want which the present chair-seat supplies. Considered as a new article of manufacture, if the complainant's chair-seat has no frame, and its novelty and utility consist in its adaptability to be sold separate from the frame, and to be readily applied by any person to any chair, then the reissue is for a different invention from that disclosed in the original patent.

"In conclusion, in view of the former decision of this court, the complainant can only succeed upon the theory that, by imparting a concave form to his chair-seat, he has imparted sufficient patentable novelty to his article to sustain a patent; and this when such a form of chair-seat was old, the material used was old, and the method of imparting the form to the material was old. This theory cannot stand."

On the argument of the appeal the following considerations were strongly urged, as grounds for reversing the decree: An article of manufacture is patentable, under section 4886 of the Re-

vised Statutes, if it is new and useful. This chair-seat was new and useful. There did not exist before, as an article of manufacture, a chair-seat composed of laminæ of wood, with the grains crossed, and glued together, moulded to be concave, and perforated. The statute makes novelty and utility the only test of patentability. In a suit for infringement, the decision of the Commissioner of Patents is final, as to the matters involved in granting a patent, except as to the questions specifically enumerated as defences, in the five subdivisions of section 4920 of the Revised Statutes. Unless substantially the same thing existed before, the article, if useful, is new and patentable. The decision of the Commissioner of Patents to that effect is not reviewable in a suit on the patent.

It is a sufficient answer to these suggestions to say, that the questions presented are not open ones in this court.

In *Mahn* v. *Harwood*, 112 U. S. 354, 358, it was said : " The statutory defences are not the only defences which may be made against a patent. Where it is evident that the Commissioner, under a misconception of the law, has exceeded his authority in granting or reissuing a patent, there is no sound principle to prevent a party sued for its infringement from availing himself of the illegality, independent of any statutory permission so to do. . . . In cases of patents for inventions, a valid defence not given by the statute often arises where the question is, whether the thing patented amounts to a patentable invention. This being a question of law, the Courts are not bound by the decision of the Commissioner, although he must necessarily pass upon it." Several cases in this court were there cited to this effect.

On the other point presented it was said, in *Thompson* v. *Boisselier*, 114 U. S. 1, 11, that, under art. 1, sec. 8, subdivision 8 of the Constitution, a patentee " must be an inventor and he must have made a discovery ; " that " the statute has always carried out this idea," referring to § 6 of the act of July 4, 1836, 5 Stat. 119, and § 24 of the act of July 8, 1870, 16 Stat. 201, and § 4886 of the Revised Statutes ; that " it is not enough that a thing shall be new, in the sense that, in the shape or form in which it is produced, it shall not have been before known, and

that it shall be useful, but it must, under the Constitution and the statute, amount to an invention or discovery." A large number of cases in this court were there referred to, and one especially, where the thing claimed was new, " in the sense that it had not been anticipated by any previous invention, and it was shown to have superior utility, yet it was held not to be such an improvement as was entitled to be regarded in the patent law as an invention." A case to the same effect at this term is *Yale Lock Mfg. Co.* v. *Greenleaf*, 117 U. S. 554.

It is strongly urged that Gardner's seat is cheap, strong, durable, can be applied to different chair-seat frames, can be sold separate from chair-seat frames, and can be applied to chair-seat frames by unskilled labor; and that, therefore, it was patentable. But these views are fully met by the observations of the court below, above set forth.

The fabric being old, the suggestion to construct chair-seats out of it being old, the shaping of it in a former being old, the perforation of a seat for ventilation and ornamentation being old, and the giving of a concave shape to a wooden seat by pressure being old, there cannot, in view of the disclaimers in the second reissue, be anything patentable in the structure. It was convenient to sell and convenient to buy, and commercially a good article. But a patent cannot be taken out for an article, old in purpose and shape and mode of use, when made for the first time out of an existing material, and with accompaniments before applied to such an article, merely because the idea has occurred that it would be a good thing to make the article out of that particular old material. Beyond that, the suggestion in the second reissue, that " the seat is adapted to be secured to any chair-frame, as it is easily cut and fitted to the same," is not found in the original patent, or in the first reissue; and is new matter, so far as anything in it can be invoked to confer patentability on the article.

The second reissue appears, by the decision of the examiners-in-chief of the Patent Office, on appeal, found in the record, to have been granted on the sole ground that Gardner's chair-seat was an independent article, formed and shaped as described, to be put on the market by itself, and ready to be attached to a

chair-frame, and not to be marketed as a component part of a chair, but as a seat ready to be fitted and affixed to a chair. Nothing to this purport being found in the original patent, or in the first reissue, and the first reissue having been applied for more than 3 years and 10 months, and the second reissue more than 7 years and 5 months, after the original patent was granted, no ground for patentability can be derived from the insertion of such suggestions in the second reissue.

There was a recent instructive case in England, in the Court of Appeal, before Lord Coleridge and Justices Field and Bowen, *Saxby* v. *Gloucester Waggon Co.*, 7 Q. B. D. 305, where the question was, whether " the invention specified was such a substantial improvement on what had already been known and published as to render it the proper subject of a patent." The specified patented combination did not before exist, but it existed with the exception of two pieces of mechanism, and their use for the purpose of doing what they did in the combination was well known. But it was held that the combination might have been made " by any intelligent mechanical workman," with no other instructions than those contained in a prior patent to the same inventor ; and that there was no novelty in the combination sufficient to constitute a patent. In regard to another branch of the case, it appeared, that, taking two prior separate inventions together, every element of the patent in question was to be found in one or the other of those inventions, and it was held that the combination of the two prior inventions did not require " an exercise of such an amount of skill and ingenuity as to entitle it to the protection of an exclusive grant." This case is referred to for the purpose of showing that the question of patentability, as depending on the *quantum* of inventive skill in a given case, is one which the courts of England consider in a suit for infringement. See, also, *Penn. Railroad Co.* v. *Locomotive Truck Co.*, 110 U. S. 490, and the cases there collected.

The decree of the Circuit Court is                    *Affirmed.*